[Cite as *State v. Ayers*, 2026-Ohio-1040.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 115129 |
| v. | : | |
| RONALD AYERS, | : | |
| Defendant-Appellant. | : | |

**JOURNAL ENTRY AND OPINION**

**JUDGMENT:** AFFIRMED IN PART; REVERSED
AND REMANDED IN PART
**RELEASED AND JOURNALIZED:** March 26, 2026

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-693751-A

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney and Carley Berman, Assistant Prosecuting
Attorney, *for appellee.*

Law Office of John T. Forristal and John T. Forristal, *for
appellant*.

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant Ronald Ayers ("Ayers") appeals his convictions

for one count of attempted murder, six counts of felonious assault, and one count of

having weapons while under disability.  He raises the following assignments of error for review:

> **Assignment of Error I:**  The trial court erred when it denied [Ayers's] motion for a new trial.
>
> **Assignment of Error II:**  The trial court erred when it failed to merge the attempted murder and felonious assault counts prior to sentencing.
>
> **Assignment of Error III:**  [Ayers's] sentence was contrary to law because the trial court failed to comply with R.C. 2929.19(B)(2)(c).

{¶ 2}  After careful review of the record, we affirm Ayers's convictions.  However, we reverse Ayers's sentence because he was improperly sentenced on allied offenses of similar import.  In addition, the trial court incorrectly imposed the minimum and maximum prison terms as set forth in R.C. 2929.144(B)(2) and (C) and failed to properly advise Ayers of the notification requirements as set forth in R.C. 2929.19(B)(2).  Therefore, this case is remanded to the trial court for resentencing.

## I.  Facts and Procedural History

{¶ 3}  In July 2024, Ayers was charged in an 11-count indictment stemming from a shooting that occurred at a house party in Cleveland, Ohio, in the early morning hours of June 29, 2024.  Three people were injured in the shooting, including Joey Freeman ("Freeman"), Jeremy Irons ("Irons"), and Jamal Black ("Black").  Three counts of the indictment alleged attempted murder (one count for each victim), which are first-degree felonies; six counts of the indictment alleged felonious assault (both serious physical harm and deadly weapon for each victim),

which are second-degree felonies; and one count of the indictment alleged having weapons while under disability, which is a third-degree felony. Each count included one- and three-year firearm specifications, as well as notices of prior convictions and repeat-violent-offender specifications. The matter proceeded to a jury trial on all but count for the having weapons while under disability and the notice-of-prior-conviction and repeat-violent-offender specifications, which were tried to the bench.

{¶ 4} Ten witnesses testified on behalf of the State. The following is a summary of the testimony presented at trial.

{¶ 5} At approximately noon on Friday, June 28, 2024, Ayers arrived at Freeman and his wife, Robyn Ramsey's ("Robyn") home on Carolina Road in Cleveland, Ohio to "kick it" on the porch. (Tr. 267.) Freeman and Ayers had been friends for over 25 years. They did "everything together"; Ayers was like a brother to Freeman. (Tr. 177.) Recently, however, the two "fell out real bad" and did not talk for a month. (Tr. 268.) Robyn testified that Freeman and Ayers "made up" approximately three to four weeks before the shooting, but Robyn felt that Ayers's demeanor had changed towards them. (Tr. 269.) Ayers was not as friendly or genuine towards Freeman and Robyn.

{¶ 6} Later in the day of June 28, several more people arrived at the Carolina house for a friend's birthday. Throughout the evening approximately 20-30 people were in the front yard drinking and listening to music. After the party goers decided to move to a bar, Freeman locked his house and turned off the music. Freeman testified that he exited the house and stood in the middle of the driveway

with his friend Mike Miller ("Mike"), Ayers, Black, and Irons. Freeman testified "we were just standing there. There was nothing said. And the next thing I know, I see — I see [Ayers] pull a gun and start shooting." (Tr. 182.) He testified that Ayers shot Irons first, who ran towards Superior Avenue. Ayers then shot Black in the head and then turned and shot Freeman three times. Freeman was shot twice in the stomach and once in the arm. He testified that Ayers was five to ten feet away from him and that he was 100 percent certain that Ayers shot him "[b]ecause it was my best friend. I know who [Ayers] is. I know [Ayers]. Like I know who [Ayers] is in the dark or the light. I've been around [Ayers] for too long. I just know [Ayers]." (Tr. 188.) Freeman also testified that he was in the hospital for weeks and had multiple surgeries because of the shooting and still suffers from the injuries.

{¶ 7} On cross-examination, Freeman was questioned about Mike, whose last name he did not know, but testified on redirect that Mike was one of their friends. He again testified, "I seen [Ayers] shoot me and I seen [Ayers] shoot the other two people. [Ayers] shot me last." (Tr. 218.)

{¶ 8} Robyn testified that immediately preceding the shooting, Black brushed up against Mike and words were exchanged. She also testified that Mike and Ayers were friends. She explained that "[e]verybody call each other brothers," meaning that they were all friends. (Tr. 277.) Robyn testified that she was standing next to Freeman when Ayers pulled out a gun and started shooting. She did not see who Ayers shot because Freeman pushed her and told her to run. She testified that she and her little sister ran away towards the opposite side of their house. Then

Ayers "ended up on the side with us." (Tr. 281.) Robyn explained that Ayers did not say anything but she "got scared and ran" back towards Freeman because she learned that Freeman had been shot. (Tr. 284.)

{¶ 9} A cellphone video taken by Robyn's neighbor was played for the jury. (State's exh. No. 200.) Robyn identified herself, her sister, and Ayers in State's exhibit No. 200. In the video, seven shots can be heard and then Robyn and her sister can be observed running into the neighbor's driveway. Then Ayers can be observed running towards Robyn and her sister. Robyn then runs back towards Freeman, and Ayers heads in the opposite direction. (State's exh. No. 200.)

{¶ 10} Robyn testified that she ran to Freeman and lay next to him, putting pressure on his wounds. She also held Black's hand and encouraged him that "it's going to be okay." (Tr. 284.) She could hear the sirens and knew help was arriving soon.

{¶ 11} When Robyn was at the hospital with Freeman, Ayers repeatedly contacted her by text message and social media. Ayers inquired about Freeman and Black's status and whether anyone had spoken with the police. He texted, "I don't need none of them passing, especially my brother [Freeman]. That ni*** talked to police." (Tr. 295.) Ayers also questioned whether Black had spoken to police. Robyn informed Ayers that no one had spoken to police. Ayers did not contact Robyn after July 1, 2024, and never visited Freeman at the hospital.

{¶ 12} On cross-examination, Robyn testified that she told Freeman's parents, while they were at the hospital, that Ayers was the shooter. In addition,

Robyn was questioned about Mike and confirmed that at the time of the shooting, Mike was her little sister's boyfriend. She testified that she informed the detective that Black and Mike had an incident prior to the shooting. She also confirmed that Irons had a gun in his waistband that evening but never drew his weapon. She did not see anyone else with a gun besides Ayers and Irons. Robyn explained that she gave the names of every person she could remember that was at the party to the detective. When questioned about whose names she provided, she stated, "My husband was on his death bed. You think I really cared at the time about naming how many people that was outside?" (Tr. 319.) She explained, "I met all these people through my husband when I moved over there with him. I dealt with these people because of my husband." (Tr. 320-321.) When questioned why she responded to Ayers calls and texts she responded, "You think I'm not scared for my life and traumatized by all this? Of course, I'm going to answer the man's calls and texts. I'm scared. If I ignored it, then what? How do I know anybody going to want to shoot me next[?]" (Tr. 321.) Robyn testified that she told the detective that she was afraid Ayers would retaliate and she did not want to be involved in the case.

{¶ 13} Freeman's cousin Lovetta Freeman ("Lovetta") testified that she considered Ayers a friend and that he was part of the "friend group" that "hung around everyday together." (Tr. 335.) On the night of the shooting, Lovetta arrived later in the evening and parked her car across the street from the party. She set up two chairs in the driveway, sat down, and waited to go to the bar with everyone. She said she was seated near Freeman, Robyn, Black, and Irons right before the

shooting. Lovetta described hearing nine or ten gunshots and seeing fire come from the gun Ayers was holding. She testified that Ayers was shooting at the circle of people that included her. Lovetta testified that Freeman, Black, and Irons were shot. She stated that she got in her car and drove around the block and waited until everyone left. When she returned, she observed Robyn laying on top of Freeman trying to stop the bleeding and someone helping Black. She stated that Irons had run towards Superior Avenue. After the police and ambulances arrived, she called her uncle, Freeman's father, to inform him about the shooting and to tell him to which hospital Freeman was taken.

{¶ 14} On July 4, 2024, Freeman's father accompanied Lovetta to the police station to make a statement and view a photo array. She testified that her uncle accompanied her because she was afraid of retaliation for speaking with police. Nevertheless, Lovetta went to the police station where she picked Ayers out of the photo array and wrote that she was "1000%" sure that Ayers was the shooter. (State's exh. No. 100.) She identified Ayers in the courtroom as the shooter.

{¶ 15} Black testified that he went to the party with a friend. He was intoxicated before he arrived because he does not drink with people he does not know. He said that there were approximately 50 people at the party, but he only knew Freeman and Irons. Black testified that he got shot in the back of the head and went blind. He did not see anyone else get shot because he could not see. He stated that he still had a blood clot in his head, bullet fragments in his brain, and a bullet in his arm from the shooting. He testified that he did not know Ayers, or who shot

him. Black stated that he did not want to testify. He explained that he has posttraumatic stress disorder and no longer leaves the house because of the shooting.

{¶ 16} Officer James Ortells ("Officer Ortells") of the Cleveland Police Department described the night of the shooting, explaining that he and his partner were on patrol in the area when they observed Irons stumbling across Superior Avenue, clearly suffering from a gunshot wound. He also observed Irons holding a handgun. Officer Ortells testified that they approached Irons to investigate. Irons then collapsed on the ground and handed his gun to the officers. Officer Ortells testified that Irons's gun was fully loaded and had not been fired. Officer Ortells stated that while his partner was rendering aid to Irons, several people approached the officers and informed them that two other people were shot on Carolina Road. Officer Ortells called for police assistance and medics while his partner continued to render aid to Irons. He testified that he observed that Irons had multiple gunshot wounds. After medics arrived, Officer Ortells and his partner went to Carolina Road to assist. He described the scene as chaotic and stated that one person at the scene claimed that the shooter came from Superior Avenue and shot at the party. Officer Ortells's bodycam was played for the jury. (State's exh. No. 158.)

{¶ 17} Officer Andrea Renshaw ("Officer Renshaw") of the Cleveland Police Department testified that she arrived on the scene of the shooting on Carolina Road. She described the scene as chaotic and testified that at first it was unclear how many people had sustained injuries. Officer Renshaw rendered aid to Black who had been

shot in the back of the head. She wrapped his head in gauze and kept Black conscious and talking. She testified that her partner rendered aid to Freeman who had been shot multiple times in the abdomen. Officer Renshaw's bodycam was played for the jury. (State's exh. No. 159.)

{¶ 18} Detective Robby Prock ("Det. Prock") of the Cleveland Police Department's Crime Scene Unit testified regarding the photographs and collection of evidence at the scene of the shooting, as well as the fast-food restaurant on Superior Avenue, and the tire shop across the street from the restaurant. He collected seven spent shell casings congregated on the street near the apron of Freeman's driveway. The casings consisted of two different brands. There were five USA 9 mm cartridge casings and two FC 9 mm cartridge casings. Det. Prock testified, in his experience of hundreds of shooting scenes, that it was more common that people used different brands than the same manufacturer, essentially implying that there was one shooter.

{¶ 19} The last witness to testify was Detective Tywon Little ("Det. Little") of the Cleveland Police Department Fifth District. He testified that he has been a detective in that district for four years and that in a year the detectives in his district handle approximately 250 cases each. He explained that the residents in the district are not particularly cooperative with police because they are afraid of retaliation from the neighborhood and many do not trust the police.

{¶ 20} When Det. Little was assigned to the case, he learned from the detective that was on scene soon after the shooting that no one provided any

information or names of possible suspects. Det. Little testified that on June 29, 2024, he went to the hospital where the three victims were being treated. He described the hospital as chaotic, stating that the nurses feared the shooter would come to the hospital to "finish the job." (Tr. 535.) Det. Little explained that he could not speak with any of the victims because they were in surgery.

{¶ 21} Det. Little reviewed bodycam footage and spoke with several people attempting to develop a suspect. In addition, he retrieved video footage from the restaurant's drive-thru that is located near the shooting. He testified that he had to drive to the city of Parma to retrieve the video because the manager feared retribution from the neighborhood for cooperating with police. The video was played for the jury and depicts Irons repeatedly falling in the driveway of the drive-thru clearly in pain from being shot. (State's exh. No. 164.) Irons's handgun can also be observed in the video.

{¶ 22} Det. Little also retrieved a cellphone video from Freeman's neighbor who happened to be recording from her driveway when the shooting occurred. The video captures the audio of the shots and Robyn and her sister running up the neighbor's driveway, away from the shooting. (State's exh. No. 200.) The video also captures Ayers running towards Robyn and her sister and then walking away from the scene. The video was played for the jury during Robyn's testimony.

{¶ 23} Det. Little testified that he received a tip on July 2, 2024, from another detective that Freeman's father indicated that he could provide the name of the shooter to detectives. Det. Little spoke with Freeman's father who explained that

Freeman identified Ayers as the person who shot him. At the time, Freeman was in surgery again and could not speak with Det. Little directly. Freeman's father also provided Lovetta's name and phone number to the detective because she witnessed the shooting. Det. Little testified that on July 4, 2024, Lovetta and Freeman's father arrived at the police station to speak with police about the incident. Lovetta identified Ayers from a photo array and gave a statement to the detective asserting that she witnessed Ayers shoot Freeman, Irons, and Black.

{¶ 24} The next day, Det. Little went to the hospital and spoke with Irons. Irons was shown a photo array that included Ayers; however, Irons was unable to identify the shooter. During cross-examination it was revealed that Irons suggested the shooter was younger than Ayers.

{¶ 25} On July 8, 2024, Det. Little issued an arrest warrant for Ayers based on Freeman's statements to his father and Lovetta's statement to police and her identification of Ayers from a photo array. Det. Little was unable to speak with Robyn or Freeman until July 18, 2024, because Freeman was in and out of surgery multiple times and was intubated much of the time. When Det. Little interviewed Freeman and Robyn, they both identified Ayers as the shooter and explained what they observed of the shooting. Eventually, a photo array was administered to Freeman and Robyn in November 2024. They identified Ayers with 100 percent certainty.

{¶ 26} Det. Little also testified that he attempted to obtain information about Mike because Irons indicated the shooter was younger. He explained that Robyn

provided an Instagram handle and photo of Mike, which was submitted to the Northeast Ohio Regional Fusion Center ("Fusion Center"). The Fusion Center was able to identify Mike's full name and date of birth, which information was provided to Det. Little. He intended to administer a second photo array to Irons.

{¶ 27} On cross-examination, Det. Little explained that a second photo array was never administered to Irons because Irons did not cooperate with the investigation after he was released from the hospital on July 8, 2024. Det. Little also clarified that Mike was identified as being at the party but was not identified as the shooter. Det. Little admitted that he did not document any of this information about Mike in his written report; however, the interview with Irons was recorded on his bodycam. Det. Little confirmed that Irons asserted that the shooter was younger than the men in the photo array and that Irons did not know many people at the party because he was not from the area. He also confirmed that Irons went to the party with Black.

{¶ 28} Two doctors from University Hospitals testified regarding the treatment of Freeman's, Irons's, and Black's injuries testifying that all three sustained life-threatening injuries.

{¶ 29} The jury found Ayers not guilty of the attempted murder of Irons and Black. However, the jury found Ayers guilty of one count of attempted murder of Freeman, both counts of felonious assault of Freeman, both counts of felonious assault of Irons, both counts of felonious assault of Black, as well as the attendant firearm specifications. The trial court found Ayers guilty of having weapons while

under disability, as well as the notice-of-prior-conviction and repeat-violent-offender specifications.

{¶ 30} The trial court sentenced Ayers to the mandatory three-year firearm specification on each count, which was ordered to be served prior to and consecutively with the sentence on the base charges. Ayers was sentenced to 10 years in prison on Count 3, attempted murder of Freeman; 3 years on Count 4, felonious assault (serious physical harm) of Irons; 5 years on Count 5, felonious assault (serious physical harm) of Black; 5 years on Count 6, felonious assault (serious physical harm) of Freeman; 5 years on Count 7, felonious assault (deadly weapon) of Irons; 5 years on Count 8, felonious assault (deadly weapon) of Black; 5 years on Count 9, felonious assault (deadly weapon) of Freeman; and 36 months on Count 10, having weapons while under disability.[1] None of the counts were merged at sentencing. Counts 3 and 5 were ordered to be served consecutively, for a total of 6 years in firearm specifications and 15 years for the base charges. The remaining counts were ordered to be served concurrently. The trial court advised Ayers that he was subject to an indefinite sentence of 10-15 years in prison on Count 3. The trial court ordered the necessary postrelease control on each count and ordered Ayers to pay court costs. Ayers was granted 296 days of jail-time credit.

---

[1] We note that the original sentencing entry dated May 7, 2025, did not set forth a sentence on the base charge for Count 4. On May 14, 2025, Ayers filed a notice of appeal. On May 22, 2025, the trial court corrected the May 7 entry and set forth the sentence on Count 4. The trial court was without jurisdiction to correct the May 7 entry. Then on January 16, 2026, this court remanded the case to the trial court to issue a nunc pro tunc entry correcting the May 7 journal entry.

## II. Law and Analysis

{¶ 31} In Ayers's first assignment of error, he argues that the trial court erred by not granting his Crim.R. 33 motion for new trial because the State withheld favorable and material evidence from Ayers. He argues that the State violated Ayers's due-process rights and *Brady v. Maryland*, 373 U.S. 83 (1963). We find no merit to Ayers's argument.

{¶ 32} Generally, "'[a] reviewing court will not disturb a trial court's decision granting or denying a Crim.R. 33 motion for new trial absent an abuse of discretion.'" *State v. Akins*, 2025-Ohio-5632, ¶ 43 (8th Dist.), quoting *State v. Smith*, 2018-Ohio-4691, ¶ 24 (2d Dist.), citing *State v. LaMar*, 2002-Ohio-2128, ¶ 82. However, "a trial court's ruling on a motion for new trial claiming a *Brady* violation should be reviewed using 'a due process analysis rather than an abuse of discretion test because the issue on review concern[s] [the defendant's] due process right to a fair trial, namely the suppression by the prosecution of evidence favorable to [the defendant].'" *Smith* at ¶ 24, quoting *State v. Johnston*, 39 Ohio St.3d 48, 60 (1988). Accordingly, we conduct a de novo review of a trial court's ruling on a motion for new trial that alleges a *Brady* violation. *State v. Azali*, 2023-Ohio-4643, ¶ 60 (8th Dist.). "'Under a de novo standard of review, we give no deference to a trial court's decision.'" *State v. Buehner*, 2021-Ohio-4435, ¶ 43 (8th Dist.), quoting *Brownlee v. Cleveland Clinic Found.*, 2012-Ohio-2212, ¶ 9 (8th Dist.).

{¶ 33} Here, Ayers filed a motion for new trial under Crim.R. 33(A)(6) within two weeks of the jury verdict asserting a *Brady* violation because it was not

disclosed that Mike was a possible suspect in the shooting until Det. Little's testimony on cross-examination. Crim.R. 33(A)(6) states:

> A new trial may be granted on motion of the defendant for any of the following causes affecting materially the defendant's substantial rights:
>
> . . .
>
> (6) When new evidence material to the defense is discovered which, the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

{¶ 34} "When asserting a *Brady* violation, the defendant bears the burden of demonstrating that his or her due process rights were violated." *State v. Gillis*, 2024-Ohio-726, ¶ 62 (8th Dist.), citing *State v. Glover*, 2016-Ohio-2833, ¶ 35 (8th Dist.). In *Brady*, the United States Supreme Court held that a state violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution by suppressing evidence favorable to the accused where the evidence is material to guilt or to punishment, irrespective of the good or bad faith of the prosecution. *Brady*, 373 U.S. at 87. Further, the knowledge of the police department is imputed to the state when assessing a *Brady* violation. *State v. Sutton*, 2021-Ohio-854, ¶ 130 (8th Dist.), citing *Glover* at ¶ 47.

{¶ 35} Recently, in *State v. Brown*, 2024-Ohio-749, the Ohio Supreme Court reiterated that in order "[t]o establish a *Brady* violation, a defendant must

demonstrate (1) that the evidence is favorable to the defendant, because it is either exculpatory or impeaching, (2) that the evidence was willfully or inadvertently suppressed by the state, and (3) that the defendant was prejudiced as a result." *Id.* at ¶ 30*,* citing *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999). The *Brown* Court explained that "[e]vidence is material—or prejudicial— '"when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."'" *Id.* quoting *Turner v. United States*, 582 U.S. 313, 324 (2017), quoting *Cone v. Bell*, 556 U.S. 449, 469-470 (2009). In addition, "*Brady* applies to the 'the discovery, after trial, of information which had been known to the prosecution but unknown to the defense.'" *Id.* at ¶ 31, quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976). "'Strictly speaking, *Brady* is not violated when disclosure occurs during trial, even when disclosure surprises the defendant with previously undisclosed evidence.'" *Id.*, quoting *State v. Iacona*, 93 Ohio St.3d 83, 100 (2001); *see also State v. Wickline*, 50 Ohio St.3d 114 (1990) (finding there is no *Brady* violation when the alleged exculpatory records were presented during trial).

{¶ 36} Nevertheless, the *Brown* Court acknowledged that "three justices in *Iacona* suggested that 'the philosophical underpinnings of *Brady* support the conclusion that even disclosure of potentially exculpatory evidence during trial may constitute a due process violation if the late timing of the disclosure significantly impairs the fairness of the trial.'" *Id.*, quoting *Iacona* at 100. The *Brown* Court, however, declined to address whether a *Brady* violation is ever properly grounded

in evidence disclosed during trial because Brown forfeited any *Brady* claim by not objecting during trial.

{¶ 37} Here, Ayers did not object during trial because the information was advantageous to him. Nevertheless, the information was not disclosed until the cross-examination of Det. Little. Ayers specifically complains that it was not learned until cross-examination that Det. Little emailed the Fusion Center in an effort to identify Mike through a photo provided by Robyn and his Instagram handle "plat_thugga." The email asserted that "plat_thugga" was a possible suspect in the shooting. Det. Little testified that he wanted to administer a second photo array to Irons because Irons indicated the shooter was younger than the individuals included in the photo array with Ayers. Ayers asserts that this information was material because he was unaware that Mike was considered a possible suspect in the shooting. He argues that "[t]he potential existence of another shooter is especially pertinent because two types of 9 mm casing[s] were found at the scene, indicating that there could have been more than one shooter." (Ayers brief p. 13.) Ayers maintains that he was prejudiced by the late disclosure.

{¶ 38} Assuming, without deciding, that the State's disclosure of evidence during trial constituted a due-process violation, we find that Ayers did not demonstrate prejudice. As the trial court aptly stated:

> I am hard-pressed to find a *Brady* violation at this — at this juncture. If any items were omitted inadvertently or disclosed late, I don't believe they meet the threshold under the *Brady* rule. Specifically for a *Brady* violation to have occurred the evidence must be both favorable to the accused and be able to materially affect the outcome of the case. There

is no reasonable probability that the outcome of the trial would have been different if the evidence would have been disclosed earlier. As I stated back in chambers earlier, I think your argument would have been more cogent if the parties didn't even know each other. If this was stranger on stranger identification, I think that your motion would have a lot more merit. Also, no motive has been revealed about why the witnesses would want to unfairly implicate their friend. I think that the idea that there is another shooter is such a remote possibility, it is definitely plausible, not probable. The prosecution, I think, has acted in good faith, has adhered to the constitutional requirements. And if any issues of late disclosures did exist, they're insufficient to support your claim of prejudice materiality as required by law.

(Tr. 758-759). We agree with the trial court's assessment. Furthermore, the questions posed during cross-examination revealed that Ayers was aware, prior to trial, that Irons claimed the shooter was younger than Ayers, which by definition meant there was another possible suspect. That information was presented to the jury. In addition, Mike's identity was testified to by Freeman, Robyn, and Det. Little. All three witnesses were cross-examined about Mike. Thus, Ayers had ample opportunity to address whether Mike, or someone younger than Ayers, participated in the shooting.

{¶ 39} After careful review of the record, we cannot say that there is a reasonable probability that, had the evidence been disclosed, the result of the trial would have been different. Accordingly, we find that it was not error for the trial court to deny Ayers's motion for new trial because Ayers's due-process rights were not violated.

{¶ 40} Ayers's first assignment of error is overruled.

{¶ 41} In Ayers's second assignment of error, he argues that the trial court erred when it failed to merge allied offenses of similar import. He contends that the felonious assault verdicts under R.C. 2903.11(A)(1) (knowingly cause serious physical harm) and R.C. 2903.11(A)(2) (knowingly cause physical harm by means of a deadly weapon — firearm) should merge with each other as applied to the victims Irons, Black, and Freeman. In addition, Ayers asserts that the felonious assault verdicts as applied to Freeman should merge with the attempted murder verdict under R.C. 2923.02/R.C. 2903.02(A) (attempt to purposely cause the death). We find merit to Ayers's argument.

{¶ 42} Appellate courts review whether offenses are allied offenses of similar import under a de novo standard. *State v. Sims*, 2024-Ohio-250, ¶ 28 (8th Dist.), citing *State v. Williams*, 2012-Ohio-5699, ¶ 28. An accused's failure to raise the issue of merger in the trial court forfeits all but plain error, and a forfeited error is not reversible error unless it affected the outcome of the proceeding and reversal is necessary to correct a manifest miscarriage of justice. *State v. Rogers*, 2015-Ohio-2459, ¶ 3. Because Ayers's trial counsel did not raise this issue in the trial court, we review for plain error. Additionally, "'[t]he defendant bears the burden of establishing entitlement to the protection provided by R.C. 2941.25.'" *Sims* at ¶ 28, quoting *State v. Davids*, 2022-Ohio-2272, ¶ 43 (8th Dist.).

{¶ 43} R.C. 2941.25 governs whether offenses are subject to merger and states:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 44} Under this statute, courts will consider three separate factors to determine whether the offenses are subject to merger: the import, the conduct, and the animus. *State v. Bey*, 2025-Ohio-740, ¶ 86 (8th Dist.), citing *State v. Ruff*, 2015-Ohio-995, paragraphs one and three of the syllabus. Specifically, "offenses do not merge, and a defendant may be convicted of and sentenced for multiple offenses if any one of the following is true: (1) the offenses are dissimilar in import or significance, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation." *Id.*, citing *Ruff* at paragraph three of the syllabus.

{¶ 45} Offenses are dissimilar in import or significance within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23. Offenses are committed separately within the meaning of R.C. 2941.25(B) if "'one offense was complete before the other offense occurred . . . notwithstanding their proximity in time and that one [offense] was committed in order to commit the other.'" *State v. Woodard*, 2022-Ohio-3081, ¶ 38 (2d Dist.), quoting *State v. Turner*, 2011-Ohio-6714, ¶ 24 (2d Dist.). Thus, "'when one offense

is completed prior to the completion of another offense during the defendant's course of conduct, those offenses are separate acts.'" *Woodard* at ¶ 38, quoting *State v. Mooty*, 2014-Ohio-733, ¶ 49 (2d Dist.). For purposes of R.C. 2941.25(B), animus has been defined as "'purpose or more properly, immediate motive.'" *State v. Priest*, 2018-Ohio-5355, ¶ 12 (8th Dist.), quoting *State v. Bailey*, 2014-Ohio-4684, ¶ 34 (8th Dist.). "'If the defendant acted with the same purpose, intent, or motive in both instances, the animus is identical for both offenses.'" *State v. Lane*, 2014-Ohio-562, ¶ 12 (12th Dist.), quoting *State v. Lewis*, 2012-Ohio-885, ¶ 13 (12th Dist.).

{¶ 46} Here, the evidence established that Ayers discharged a 9 mm handgun at Freeman, Irons, and Black multiple times in rapid succession. All three individuals were seriously injured. Ayers was then convicted of attempted murder of Freeman as charged in Count 3, felonious assault (serious physical harm) of Freeman as charged in Count 6, and felonious assault (deadly weapon) of Freeman in Count 9. Freeman sustained two gunshot wounds to the abdomen and one gunshot wound to the arm. Based on the record before this court, we find that these offenses were not of dissimilar import, were not committed separately, and were not committed with separate animus. The jury found that Ayers intended to kill Freeman and nearly accomplished his goal. Therefore, Counts 3, 6, and 9 are allied offenses of similar import and are subject to merger pursuant to R.C. 2941.25.

{¶ 47} As it pertains to Black, Ayers was convicted of felonious assault (serious physical harm) as charged in Count 5 and felonious assault (deadly weapon) as charged in Count 8. Black sustained two gunshot wounds, one to the back of the

head and one in the arm. Based on the record before this court, we find that these offenses were not of dissimilar import, were not committed separately, and were not committed with separate animus. Ayers fired multiple shots in rapid succession into a group of people intending to kill Freeman, knowing that others could be seriously injured or killed. Consequently, Counts 5 and 8 are allied offenses of similar import and are subject to merger under R.C. 2941.25.

{¶ 48} As it relates to Irons, Ayers was convicted of felonious assault (serious physical harm) as charged in Count 4, and felonious assault (deadly weapon) as charged in Count 7. Irons's medical records established that a bullet hit his left subclavian artery, his liver, and his left hand. Based on the record before this court, we find that these offenses were not of dissimilar import, were not committed separately, and were not committed with separate animus. Thus, Counts 4 and 7 are allied offenses of similar import and are subject to merger under R.C. 2941.25.

{¶ 49} Nevertheless, "[w]hen a defendant's conduct victimizes more than one person the harm for each person is separate and distinct." *Ruff* at ¶ 26. Therefore, Ayers must be sentenced separately as it pertains to each victim.

{¶ 50} Finally, under the plain error standard of review, we must first find "'an error — i.e., a deviation from a legal rule' that constitutes 'an "obvious" defect in the trial proceedings.'" *Rogers*, 2015-Ohio-2459, ¶ 22, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). However, even if the error is obvious, it must have affected Ayers's substantial rights. *Id.*, citing *id.*

{¶ 51} Here, Ayers was sentenced for offenses that should have merged, which is prohibited by the Constitution, as well as the Revised Code. Specifically, the Double Jeopardy Clause, as well as R.C. 2941.25(A) protects against multiple punishments for the same offense. *State v. Whitfield*, 2010-Ohio-2, ¶ 18. Thus, to ensure that there are not improper cumulative punishments for allied offenses, courts must be cognizant that R.C. 2941.25(A) requires that "'the trial court effects the merger at sentencing.'" *Id.,* quoting *State v. Gapen*, 2004-Ohio-6548, ¶ 135. Furthermore, "the imposition of concurrent sentences is not the equivalent of merging allied offenses" because no sentence should be entered on the merged counts. *State v. Damron*, 2011-Ohio-2268, ¶ 17.

{¶ 52} Accordingly, we find plain error because Ayers was improperly sentenced for offenses that should have merged violating his constitutional and statutory rights. In addition, ordering that allied offense of similar import be served concurrently does not cure the constitutional and statutory violation. Finally, upon remand, the State has the right to elect which offenses Ayers will be sentenced upon. *Whitfield* at ¶ 20.

{¶ 53} Ayers's second assignment of error is sustained.

{¶ 54} In Ayers's third assignment of error, he argues that the trial court failed to properly advise Ayers regarding his indefinite prison term under R.C. 2929.19(B)(2)(c), commonly referred to as the Reagan Tokes Act. The State concedes that the trial court's advisements were incomplete. Our review of the record indicates the trial court did not comply with the Reagan Tokes advisements

and improperly advised Ayers of the minimum and maximum indefinite sentence under R.C. 2929.144(B)(2) and (C).

{¶ 55} When reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 2016-Ohio-1002, ¶ 9. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it clearly and convincingly finds either that the record does not support certain specified findings or that the sentence imposed is contrary to law. An appellate court may vacate or modify a sentence that is not clearly and convincingly contrary to law only if it finds by clear and convincing evidence that the record does not support the sentence. *Marcum* at ¶ 23.

{¶ 56} The Reagan Tokes Act applies to "qualifying felonies," which are felonies "of the first or second degree committed on or after March 22, 2019." R.C. 2929.144(A). The act requires a sentencing court that is imposing a prison term for "qualifying felonies of the first or second degree" to impose an indefinite prison term for those offenses. It further specifies that these indefinite terms will consist of a stated minimum term selected by the sentencing judge from the range of basic prison terms set forth in R.C. 2929.14(A) "and a maximum term that is determined" by formulas provided in R.C. 2929.144.

{¶ 57} Here, Ayers was found guilty of multiple qualifying felonies and the trial court imposed consecutive sentences. Therefore, Ayers's sentence falls under R.C. 2929.144(B)(2), which states:

If the offender is being sentenced for more than one felony, if one or more of the felonies is a qualifying felony of the first or second degree, and if the court orders that some or all of the prison terms imposed are to be served consecutively, the court shall add all of the minimum terms imposed on the offender under division (A)(1)(a) or (2)(a) of section 2929.14 of the Revised Code for a qualifying felony of the first or second degree that are to be served consecutively and all of the definite terms of the felonies that are not qualifying felonies of the first or second degree that are to be served consecutively, and the maximum term shall be equal to the total of those terms so added by the court plus fifty [percent] of the longest minimum term or definite term for the most serious felony being sentenced.

{¶ 58} Additionally, R.C. 2929.144(C) mandates that the trial court impose the "maximum term at sentencing as part of the sentence it imposes" under R.C. 2929.14 and shall state the minimum and maximum prison terms in the sentencing entry.

{¶ 59} Ayers alleges that the trial court improperly calculated the aggregate sentencing range. We agree. The trial court incorrectly advised Ayers that he faced an indefinite sentence of 10 to 15 years in prison. However, the indefinite sentence of 5 years in Count 5 was to be served consecutively to the 10 years in Count 3. Therefore, Ayers actually faced a minimum indefinite sentence of 15 to 20 years on the base charges. In addition, the three-year firearm specifications in Counts 3 and 5 are required to be served prior to and consecutively with the base or underlying charges. Accordingly, Ayers was actually sentenced to a minimum of 21 years in prison and a maximum of 26 years in prison. The minimum and maximum sentences, however, were not properly explained or imposed during sentencing and

were not incorporated into the journal entry as required by R.C. 2929.144(B)(2) and (C).

{¶ 60} Furthermore, Ayers asserts that the trial court failed to notify Ayers in accordance with R.C. 2929.19(B)(2), which provides:

[I]f the sentencing court determines at the sentencing hearing that a prison term is necessary or required, the court shall do all of the following:

(c) If the prison term is a non-life felony indefinite prison term, notify the offender of all of the following:

(i) That it is rebuttably presumed that the offender will be released from service of the sentence on the expiration of the minimum prison term imposed as part of the sentence or on the offender's presumptive earned early release date, as defined in section 2967.271 of the Revised Code, whichever is earlier;

(ii) That the department of rehabilitation and correction may rebut the presumption described in division (B)(2)(c)(i) of this section if, at a hearing held under section 2967.271 of the Revised Code, the department makes specified determinations regarding the offender's conduct while confined, the offender's rehabilitation, the offender's threat to society, the offender's restrictive housing, if any, while confined, and the offender's security classification;

(iii) That if, as described in division (B)(2)(c)(ii) of this section, the department at the hearing makes the specified determinations and rebuts the presumption, the department may maintain the offender's incarceration after the expiration of that minimum term or after that presumptive earned early release date for the length of time the department determines to be reasonable, subject to the limitation specified in section 2967.271 of the Revised Code;

(iv) That the department may make the specified determinations and maintain the offender's incarceration under the provisions described in divisions (B)(2)(c)(i) and (ii) of this section more than one time, subject to the limitation specified in section 2967.271 of the Revised Code;

(v) That if the offender has not been released prior to the expiration of the offender's maximum prison term imposed as part of the sentence, the offender must be released upon the expiration of that term.

{¶ 61} While the trial court is not required to recite the statutory language verbatim when providing the notifications to the defendant at sentencing, the record must nonetheless reflect that each of the necessary notifications were provided. *State v. Edwards*, 2025-Ohio-5675 (5th Dist.), citing *State v. Whitehead*, 2021-Ohio-847, ¶ 43-46 (8th Dist). Here, although the journal entry suggests that Ayers was properly advised, the transcript indicates that the trial court failed to notify Ayers of any of the notifications set forth in R.C. 2929.19(B)(2)(c). When a trial court fails to advise a defendant of the requirements of the Reagan Tokes Act, the case must be remanded to the trial court for resentencing. *Whitehead* at ¶ 46.

{¶ 62} Therefore, we find that the trial court incorrectly imposed the minimum and maximum prison terms as set forth in R.C. 2929.144(B)(2) and (C) and failed to properly advise Ayers of the notification requirements as set forth in R.C. 2929.19(B)(2).[2]

{¶ 63} Accordingly, Ayers's third assignment of error is sustained.

{¶ 64} Judgment affirmed in part, reversed in part, and remanded for resentencing hearing. Upon remand the trial court is instructed to merge Counts 3, 6, and 9; Counts 4 and 7; and Counts 5 and 8. The State must elect which counts

---

[2] *See State v. Jenkins*, 2025-Ohio-2143 (8th Dist.) (S. Gallagher, J., concurring in judgment only, with separate opinion giving a detailed history of the Reagan Tokes Act and a thorough explanation of the law in practice).

Ayers will be sentenced on.  Finally, the trial court must comply with the mandates of the Reagan Tokes Act.

It is ordered that the parties split the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MARY J. BOYLE, JUDGE

LISA B. FORBES, P.J., and
ANITA LASTER MAYS, J., CONCUR